**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**

| | | |
|---|---|---|
| PATRICIA DAWSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | 1:05-cv-949-SEB-JMS |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner of the Social Security Administration, | ) ) ) | |
| Defendant. | ) | |

**ENTRY DISCUSSING COMPLAINT FOR JUDICIAL REVIEW**

Patricia Dawson ("Dawson") seeks judicial review of the denial by the Commissioner of the Social Security Administration ("Commissioner") of her application for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"), 42 U.S.C. § 301, *et seq*.

For the reasons explained in this Entry, the Commissioner's decision must be **remanded for further proceedings.**

**I. BACKGROUND**

Dawson applied for DIB on September 28, 2001, alleging an onset date of September 11, 2001. Her application was denied initially and upon reconsideration. Her request for a hearing before an Administrative Law Judge ("ALJ") was granted, and such hearing was conducted on November 19, 2003. Dawson was present, accompanied by her attorney. Medical and other records were introduced into evidence. Dawson, a friend, two medical experts and a vocational expert testified. The ALJ denied Dawson's application on March 25, 2004. On May 17, 2005, the Appeals Council denied Dawson's request for review of the ALJ's decision, making the ALJ's decision final. *See Luna v. Shalala,* 22 F.3d 687, 689 (7th Cir. 1994). This action for judicial review of the ALJ's decision followed. The court has jurisdiction over this action pursuant to 42 U.S.C. § 405(g), which provides that "[a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action . . . in [a] district court of the United States."

The ALJ's decision included the following findings: (1) Dawson met the insured status requirements of the Act on September 11, 2001, her alleged onset date, and continued to meet them through December 31, 2006; (2) Dawson had not engaged in substantial gainful activity since September 11, 2001, the alleged onset of disability; (3) Dawson had "severe" impairments consisting of fibromyalgia, asthma, degenerative and discogenic changes of the cervical spine, and a small disc herniation at T6-7; (4) Dawson's impairments did not meet and were not equivalent in severity to one of the listed impairments in Appendix 1, Subpart P of Regulations No. 4; (5) Dawson's allegations concerning the frequency and severity of her symptoms and limitations were not fully credible for the reasons set forth in the decision; (6) Dawson retained the residual functional capacity ("RFC") to occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk about 6 hours in an 8-hour workday (with normal breaks), sit about 6 hours in an 8-hour workday (with normal breaks), and push and/or pull unlimited, other than as shown for lifting and carrying; (7) based on vocational expert testimony, Dawson's past relevant work as an investigator was light work with an SVP of 4, her past relevant work as an office clerk was performed at the light exertional level and at the sedentary exertional level, both with an SVP of 5, and her past relevant work as a medical billing clerk and as a manufacturing job purchaser were both sedentary jobs with an SVP of 4; (8) Dawson was able to perform her past relevant work as an investigator, manufacturing job purchaser, medical billing clerk, and office clerk with her current RFC; and (9) Dawson's past relevant work as an investigator, manufacturing job purchaser, medical billing clerk, and office clerk did not require the performance of work related activities precluded by her RFC. With these findings in hand, and through the application of applicable rules and regulations, the ALJ concluded that Dawson was not under a "disability" as defined in the Act at any time through the date of the ALJ's decision.

## II.  DISCUSSION

### A.  Applicable Law

To be eligible for disability benefits, a claimant must prove she is unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1).

A five-step inquiry outlined in Social Security regulations is used to determine disability status. *Butera v. Apfel,* 173 F.3d 1049, 1054 (7th Cir. 1999).

> In order to determine whether an individual is entitled to disability insurance benefits, the ALJ must engage in a sequential five-step process which establishes whether or not the claimant is disabled. The claimant must show that: (1) he is not presently employed; (2) his impairment is severe; (3) his impairment is listed or equal to a listing in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) he is not able to perform his past relevant work; and (5) he

>is unable to perform any other work within the national and local economy. *Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir.1997); 20 C.F.R. § 416.920.

*Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004).

The task a court faces in a case such as this is not to attempt a *de novo* determination of the plaintiff's entitlement to benefits, but to decide if the Commissioner's decision was supported by substantial evidence and otherwise is free of legal error. *Kendrick v. Shalala,* 998 F.2d 455, 458 (7th Cir. 1993). "Substantial evidence" has been defined as "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales,* 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison v. NLRB,* 305 U.S. 197, 229 (1938)).

### B.   Analysis

In this case, the ALJ determined that Dawson had "severe" impairments consisting of fibromyalgia, asthma, degenerative and discogenic changes of the cervical spine, and a small disc herniation at T6-7, but that she could perform her past relevant work at the light and sedentary exertional levels. Dawson contends that the ALJ's decision is not supported by substantial evidence. Specifically, Dawson argues that the ALJ's analysis of her fibromyalgia and credibility were erroneous, the ALJ improperly rejected the opinions of treating physicians, the ALJ made unsupported medical conclusions, and the ALJ failed to fully and fairly develop the record of Dawson's mental impairment[1]. The Commissioner opposes each argument.

The overriding issue in this case is whether Dawson's numerous subjective complaints, which have not been easily or completely diagnosed or confirmed using objective evidence, are credible to the extent that they indicate Dawson's inability to perform work activities eight hours a day five days a week. The answer to this question is implicated in each of the arguments asserted by Dawson. The ALJ discussed the evidence at length and, for the most part, he articulated his rationale at each step of the analysis. The court cannot reweigh the evidence nor make a determination of eligibility in the first instance, but it must consider whether it can trace the path from the evidence to the ALJ's conclusions and determine whether those conclusions are supported by substantial evidence.

---

[1] The ALJ concluded that Dawson's alleged depression was not a severe impairment. (R. at 34). The ALJ reasoned that although Dawson had been placed on Prozac, it was not for depression, rather it was for fibromyalgia. He further noted that Dawson had not been treated for nor diagnosed as having depression. Dawson argues that the ALJ should have ordered additional mental health testing because of the references in the record to anxiety and a possible functional overlay to her physical complaints. The ALJ's rationale as to Dawson's depression is reasonable and based on substantial evidence. Dawson did not request that time be granted for any additional testing or evaluation of any psychological basis for her symptoms. A psychologist testified at the hearing. Under these circumstances, the ALJ did not fail to fully and fairly develop the record as to any mental impairment. On remand, if additional evidence is available, it may be considered.

3

Dawson first argues that the ALJ erred in evaluating her fibromyalgia. The Seventh Circuit has described fibromyalgia as

> [an] elusive and mysterious, disease, much like chronic fatigue syndrome, with which it shares a number of features. . . . Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia. The principal symptoms are "pain all over," fatigue, disturbed sleep, stiffness, and-the only symptom that discriminates between it and other diseases of a rheumatic character-multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch.

*Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996).

Most cases of fibromyalgia are not severe enough to render an individual disabled, but some cases can be that severe. *Id.* The ALJ noted that at least one neurologist diagnosed Dawson as having fibromyalgia, but the ALJ reasoned that it must have been a mild case because her laboratory findings were only slightly elevated. (R. at 41). The ALJ seemed to immediately acknowledge that there was no medical evidence which supported his conclusion as to the meaning of the laboratory findings when he stated, "[e]ven assuming that there is no correlation between the severity of her laboratory findings and her fibromyalgia symptoms, her fibromyalgia would not prevent her from performing work of the residual functional capacity she retains. Her subjective reports of symptoms and limitations are not fully credible." *Id.* The ALJ's reliance on the laboratory tests to conclude that Dawson's fibromyalgia was mild is not, in fact, supported by substantial evidence. *Sarchet*, 78 F.3d at 306 ("There are no laboratory tests for the presence or severity of fibromyalgia."). The ALJ further discredited the severity of Dawson's fibromyalgia when he reasoned that Dawson's subjective reports of symptoms and limitations were not fully credible. (R. at 41).

Social Security regulations provide that "[i]n determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(a). The regulations acknowledge that "symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone." 20 C.F.R. § 404.1529(c)(3). It is undisputed that Dawson's fibromyalgia symptoms cannot be supported by objective evidence. *Sarchet*, 78 F.3d at 306. Therefore, the inquiry must turn to "other evidence." "Other evidence" includes statements from the claimant, treating or nontreating sources, and others about your medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how your impairment(s) and any related symptoms affect your ability to work." 20 C.F.R. § 404.1529(a). The agency "will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements." 20 C.F.R. § 404.1529(c)(2*).*

Dawson points to several illogical or unsupported findings made by the ALJ as part of his credibility determination, which in turn would taint the ALJ's evaluation of her fibromyalgia because its symptoms are entirely subjective. The ALJ discussed the evidence of record and concluded that Dawson's allegations concerning the frequency and severity of her symptoms were "not reasonably consistent with the objective medical evidence or other evidence of record" and were, therefore, "not fully credible."  (R. at 35). The ALJ stated that "instead, the record is replete with opinions of examining physicians that the patient's symptoms are 'functional,' or 'non-physiologic' or, in some cases that the alleged symptoms simply do not have an identifiable medical etiology." *Id.* Although the ALJ also notes references of Dawson giving "variable effort" on neurological examination, (R. at 32, 187), at least one physician explained that her strength was difficult to test because she "gives out because of discomfort." (R. at 90).

Dawson argues that it is significant that the ALJ failed to discuss her repeated complaints of fatigue, especially given the fact that it is a known symptom of fibromyalgia. The Commissioner does not dispute that the ALJ did not specifically address the effect of Dawson's fatigue. In a footnote, the Commissioner asserts that Dawson did not testify that fatigue was a reason she stopped working. Dawson, however, did testify that she "definitely" had problems with fatigue or tiredness. (R. at 736). Moreover, the record is replete with complaints of fatigue. *See e.g.*, (R. at 85-87, 182, 187, 188, 194, 289, 291). One physician opined that Dawson's symptoms were consistent with chronic fatigue syndrome. (R. at 87).  The ALJ failed to articulate how Dawson's fatigue would affect her ability to work on a regular basis.  A complete evaluation of Dawson's ability to work cannot be made without addressing her severe fatigue, a symptom of fibromyalgia not demonstrated by objective evidence.

In discussing Dawson's credibility, the ALJ noted that she took care of her personal hygiene and showered, did some grocery shopping, went out to eat with her husband, attended church and traveled to her son's wedding in Texas in 2003. (R. at 35). Although it is proper to consider a claimant's activities as one factor when determining credibility, reliance on a claimant's minimal daily activities does not form an adequate basis to discredit her allegations of disability. *See Carradine v. Barnhart,* 360 F.3d 751, 755 (7th Cir. 2004) (ALJ "failed to consider the difference between a person's being able to engage in sporadic physical activities and her being able to work eight hours a day five consecutive days of the week"). None of the activities cited by the ALJ or reported by Dawson at the hearing required sustained activity, strength, or mobility. They do not support a finding that Dawson could perform her past relevant work.

The ALJ rejected the testimony of Cathy Foughies because Dawson's symptoms were not reasonably consistent with the objective medical evidence and other evidence of record.  (R. at 35). Ms. Foughies' testimony *is* "other evidence of record." Ms. Foughies testified that she was in a position to observe Dawson on a first-hand basis during the last year of Dawson's employment. (R. at 738). Ms. Foughies testified as to the progressive deterioration of Dawson's symptoms, that Dawson experienced pain associated with bending, standing, and sitting, and she could not find a position that was comfortable. *Id.* Ms. Foughies testified that Dawson had a "terrible time seeing" and that she began having difficulty controlling her bowels. *Id.* She further testified that toward the end of her employment Dawson made "a lot of mistakes" because of her difficulty sitting and focusing.

5

(R. at 739). When Dawson took phone messages, she had difficulty writing down the correct numbers. (R. at 740). The biggest issues were the constant pain and the bowel incontinence. *Id.* At times, Dawson had to leave work early to go home. *Id.* Ms. Foughies testified that Dawson "would have come to work if she was totally blind" and that it was very difficult for Ms. Foughies to have to tell Dawson that it was time for Dawson to consider other options. *Id.* The ALJ noted that Ms. Foughies confirmed Dawson's allegations. (R. at 35). He rejected Ms. Foughies' testimony because she did not explain how she was in a position, as a human resources employee, to make significant observations of Dawson at work. *Id.* As Dawson points out, however, the ALJ never asked Ms. Foughies to explain in detail her opportunities to observe Dawson. To discredit such testimony on this basis is not supported by the record.[2]

Dawson objects to the ALJ's evaluation of her use of a cane. As part of his credibility determination, the ALJ noted that Dawson appeared at some examinations and at the hearing with a cane. (R. at 35). The ALJ discredited her need for a cane because the evidence did not establish that a cane was prescribed by a physician. *Id.* Dawson points out not only that a cane requires no prescription, but treating physician Dr. Johnstone opined that sometimes Dawson must use a cane or other assistive device while engaging in occasional standing/walking. (R. at 27, 293).

The ALJ discussed Dawson's reports of fecal and urinary incontinence. A sigmoidoscopy on July 13, 2001, showed very lax sphincter tone and decreased tone in her external sphincter. (R. at 41). A physician reported on August 26, 2002, that on rectal examination Dawson had normal sphincter tone and when asked to bear down, made essentially no effort. (R. at 41, 181). The ALJ did not mention that in October 2002, a colonoscopy showed poor anal sphincter tone. *See* (R. at 85). Dawson went to a Continence Clinic and in January 2003 a nurse reported that Dawson had an estimate of two episodes of incontinence a week and Dawson should consider wearing panty liners and Depends. (R. at 41, 91, 93). There was testimony that one of the reasons Dawson had to quit working was because of her fecal incontinence. (R. at 738, 740). The ALJ concluded that Dawson's incontinence was not a severe impairment, as it would only result in minimal work-related limitations. The ALJ also reasoned that Dawson's ability to travel to Florida by car in February of 2002 and to Texas in the Spring of 2003 called into question her allegations concerning the frequency and severity of her bowel and bladder incontinence. (R. at 34). The ALJ failed to explain how taking such a trip would discredit her allegations concerning her incontinence. The ALJ never asked Dawson how she dealt with those symptoms while traveling.

There is a difference between an individual making up complaints and an individual whose complaints have not yet been diagnosed or supported by objective evidence. "Although an ALJ's credibility determination is usually entitled to deference, when such determinations rest on objective factors or fundamental implausibilities rather than

---

[2]Even though medical expert Dr. Stump specifically mentioned Dawson's strong prior work record, the ALJ failed to mention this factor when weighing Dawson's credibility. *See* Social Security Ruling 96-7p. Certainly, if considered, the evidence relating to Dawson's work record and prior earnings would weigh in favor of Dawson's credibility.

subjective considerations [such as a claimant's demeanor], appellate courts have greater freedom to review the ALJ's decision." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000) (internal quotation omitted). Even when a claimant's complaints are not fully supported by objective medical evidence, the ALJ "must investigate all avenues presented that relate to pain, including claimant's prior work record information and observations by treating physicians, examining physicians, and third parties." *Id.* at 871-72. Here, given the "logical flaws"discussed above, *Carradine,* 360 F.3d at 756, the ALJ did not "build an accurate and logical bridge between the evidence and the result," and his adverse credibility finding is not supported by the record. *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006) (internal quotation omitted). Therefore, the court cannot affirm the ALJ's analysis.

Dawson also argues that the ALJ improperly weighed the opinions of treating physicians and of the medical expert. Dr. Johnstone, a treating physician, received the reports from various neurologists and rheumatologists and opined that Dawson could sit less than 2 hours and stand/walk a total of less than two hours during an eight hour day, could rarely lift 10 pounds, could not stoop, crouch, climb ladders or stairs,[3] had difficulty picking up objects, would need several environmental restrictions, and would need unscheduled 5-10 minute breaks every 15-30 minutes. (R. at 26, 291-95, 338). Dr. Johnstone stated that Dawson's stamina lasted only a couple of hours at most. (R. at 292). He noted that a diagnosis was still uncertain and that Dawson continued to see specialists. (R. at 291).  He also noted Dawson's fatigue, visual field defects, hand and arm weakness, and incontinence. (R. at 292). Dr. Johnstone noted that Dawson had been his patient for over a year, and had been treated for neurological symptoms of neuropathy, extremity pain and generalized muscle weakness. (R. at 297). Again, the ALJ rejected Dr. Johnstone's opinion because it was not supported by objective medical findings and was inconsistent with other evidence of record. (R. at 42). Dawson's symptoms of fibromyalgia could not be supported by objective evidence. The ALJ's credibility determination also taints his evaluation of Dr. Johnstone's reports. In addition, the ALJ did not articulate what "other evidence of record" was inconsistent with Dr. Johnstone's opinions. His conclusion in this regard is not supported by substantial evidence.

Dawson contends that the ALJ erred in giving no weight to the testimony of the internal medicine medical expert in this case, Dr. Stump. After reviewing the entire record, Dr. Stump opined that Dawson's symptoms which had been considered by various neurologists and rheumatologists included loss of peripheral vision, bladder and bowel incontinence, and weakness and poor control of her hands and lower extremities. (R. at 744).  Dr. Stump noted that the physicians had not been able to determine the precise causes for these symptoms. Dr. Stump noted that a physician had diagnosed fibromyalgia but that the physician had not discussed in detail what tender points had been located. *Id.* Dr. Stump also noted that a recent report indicated that Dawson might have a neck lesion and that such a lesion could cause incontinence, weakness in the legs, and the deep tendon reflex in the knee - - most of her symptoms other than her eye impairment. (R. at 746). Dr. Stump stated in relation to Dawson's group of symptoms that "even though right

---

[3]The State Agency physicians limited Dawson to occasional climbing, balancing, stooping, kneeling, crouching and crawling, which the ALJ did not adopt because of his findings related to Dawson's credibility and the lack of objective medical evidence. (R. at 43, 421).

7

now nothing organic can be found to explain them, I think they're bona fide." (R. at 749). Dr. Stump opined that Dawson could not stand for six hours a day because of her leg weakness. (R. at 746). Dr. Stump was the only physician who reviewed the entire record and who discussed the subjective nature of Dawson's symptoms beyond the question of whether objective evidence or diagnoses existed.[4] He opined that "[r]eally, everything's subjective, however, but the pattern of this I think suggests organicity." (R. at 750).

The ALJ noted Dr. Stump's opinion that Dawson could not perform even sedentary work, but gave it no weight because 1) the objective findings did not support "such extreme functional limitations" and 2) none of Dawson's treating neurologists or treating rheumatologist had indicated that Dawson was restricted from work activities. (R. at 43). This ignores the fact that, as discussed above, treating physician Dr. Johnstone received the reports from the specialists and opined that Dawson did not have the RFC to perform sedentary work.

The ALJ's conclusions in relation to Dawson's credibility and the opinions of Dr. Johnstone and Dr. Stump do not follow from the evidence. To this extent, the court cannot trace the path of the ALJ's reasoning. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Hickman v. Apfel,* 187 F.3d 683, 689 (7th Cir. 1999) (an ALJ must "sufficiently articulate his assessment of the evidence to assure us that [he] considered the important evidence . . . [and to enable] us to trace the path of [his] reasoning.") (internal quotation omitted). Accordingly, the action must be remanded for further proceedings.

### III. CONCLUSION

For the reasons discussed in this Entry, the ALJ's conclusion at step four of the sequential analysis is not supported by substantial evidence and the court is required to **remand** the case to the ALJ for further consideration. *Melkonyan v. Sullivan,* 501 U.S. 89, 98 (1991) (a court may remand the case after passing on its merits and issuing a judgment affirming, modifying, or reversing the Commissioner's decision, a "sentence four" remand). Judgment consistent with this Entry shall now issue.

**IT IS SO ORDERED.**

Date: 09/19/2007

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

---

[4]The ALJ did note that State Agency consulting examining physician Dr. Levine opined in December 2001 that Dawson had "some type of progressive motor deficit as well as some vision problems of unknown etiology." (R. at 24). Dr. Levine opined that Dawson's "other problems such as fatigue, loss of bladder and bowel control, and peripheral vision loss could all be related to the same muscular degenerative condition." *Id*.